NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251264-U

NOS. 4-25-1264, 4-25-1265 cons.

IN THE APPELLATE COURT

FILED
February 27, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Logan County |
| CIERRA COKER, | ) | Nos. 22CF29 |
| Defendant-Appellant. | ) | 22CF30 |
| | ) | |
| | ) | Honorable |
| | ) | Jonathan C. Wright, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Steigmann and Justice Grischow concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court did not err in finding defendant posed a real and present threat to a person or the community that could not be mitigated by conditions and in denying her pretrial release.

¶ 2    Defendant, Cierra Coker, appeals the circuit court's order denying her pretrial release under section 110-6.1(a)(1.5) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-6.1(a)(1.5) (West 2024)). Defendant contends the State failed to prove by clear and convincing evidence she posed an unmitigable threat to the safety of a person or the community. We affirm.

¶ 3                          I. BACKGROUND

¶ 4    Sophia Davis, 19 months old, died on February 6, 2022, after having been in defendant's care. In Logan County case No. 22-CF-29, defendant was charged with four counts

of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2022)). The State later charged defendant, in Logan County case No. 22-CF-30, with an offense occurring approximately one month before Sophia's death. In that case, the State charged defendant with two counts of aggravated battery (*id.* § 12-3.05(b)(1), (2)), asserting defendant, on or about January 3, 2022, caused bodily harm or great bodily harm to Sophia, after fracturing Sophia's arm.

¶ 5        On February 25, 2022, the circuit court set defendant's bond at $3 million, with 10% to apply. Defendant remained in custody.

¶ 6        In August 2025, a jury trial was held on both cases. The jury deadlocked; a mistrial was declared.

¶ 7        After the mistrial was declared, defendant filed a motion to reconsider bail as a condition of pretrial release and the State responded with a verified petition to deny defendant pretrial release under section 110-6.1(a)(1.5) of the Code (725 ILCS 5/110-6.1(a)(1.5) (West 2024)). In its petition, the State argued defendant posed a real and present threat to the safety of any person or persons or the community. The State asked the circuit court to take judicial notice of the evidence at trial that showed the following: In January 2022, defendant turned 20 years old. She dated and resided with Sophia's father. In early January 2022, defendant was the adult caregiver of Sophia. While in defendant's care, Sophia was injured, after which Sophia's mother sought medical care and Sophia was diagnosed with "a possible broken arm and multiple planes of injury to her face." On February 6, 2022, Sophia was again in defendant's care. While Sophia's siblings played video games, Sophia bit defendant's finger. Defendant yelled at Sophia and then took her into a bedroom, where Sophia suffered severe injuries leading to her death. The autopsy results reveal Sophia suffered "injuries to her forehead, back of [her] head, eyes, face, chest, back, buttocks, arm, leg, and brain." The forensic pathologist concluded Sophia died

from blunt-force injuries to her head. Another expert testified the injuries Sophia suffered in January 2022 were consistent with child abuse.

¶ 8        In support of its petition to detain defendant, the State emphasized the nature and circumstances of Sophia's death showed exceptionally brutal or heinous behavior indicative of wanton cruelty. The State emphasized the injuries to Sophia's head showed she was repeatedly struck by an object or against an object, the force of which "caused Sophia's brain to strike her cranium, shearing blood vessels, causing intercranial bruising, and retinal tears and folds in her eyes." The State further emphasized, when Sophia's death occurred, an investigation by the Illinois Department of Children and Family Services (DCFS) was pending due to the alleged abuse in early January 2022. The State further highlighted the circuit court's conclusion defendant had a propensity to commit violence and the resulting jury instruction permitting the jury to consider that propensity.

¶ 9        At the hearing on the State's petition, the State called Nate Kessinger, an electronic monitoring chief for the Office of Statewide Pretrial Services (OSPS). Kessinger testified OSPS monitors software and responds to alarms if someone is noncompliant. Electronic monitoring would not detect whether a person is committing a violent act or crime while on electronic monitoring, nor would it detect if someone who was not permitted to have contact with a client entered an exclusion zone.

¶ 10       Defense counsel called Jeff Koch, a pretrial officer with OSPS, to testify. Koch testified, in September 2025, he prepared a pretrial services report on defendant. Koch found no evidence of a juvenile or adult arrest or adjudication. He found no misdemeanor traffic cases. Defense counsel questioned Koch about the Virginia Pretrial Risk Assessment Instrument-Revised tool, which, in 2022, was not completed after defendant's arrest. Defense

counsel attempted to elicit testimony defendant would have scored a 0 in 2022, but the circuit court would not allow it.

¶ 11 Heather Buchen, defendant's mother, testified she had been in a relationship with Kevin Bruce since defendant was two or three years old. She and Bruce married, and Bruce took on the role of defendant's father. Defendant's maternal grandmother resided with Buchen and Bruce. Buchen worked as an assistant manager at Casey's six days a week. Buchen's schedule was flexible. Bruce worked as a manager for a pest-control company. Buchen testified, "[A] lot of times he's at home on the computer." Defendant was welcome to stay in Buchen's home if she were released. Buchen testified she, her mother, and Bruce would be available to supervise defendant. As her mother did not work or drive, defendant's grandmother was "home 24/7." No children lived in the home. The nearest neighbors with children lived "two blocks over." Buchen agreed she would help supervise an order barring defendant from contact with minors.

¶ 12 According to Buchen, defendant worked at Goodwill before her arrest. She obeyed the rules "[m]ost of the time." Defendant did not abuse alcohol or drugs, was not suspended or in trouble at school, and had not been in juvenile court. Defendant had not physically attacked Buchen or Bruce. When defendant was 15 years old, Bruce's daughter and her newborn son moved into the house. Because Bruce's daughter suffered postpartum depression, defendant "was always the one taking care of [the newborn]." Because Buchen and Bruce worked, defendant skipped school to care for the newborn. Defendant also provided child care for Bruce's cousin.

¶ 13 On cross-examination, Buchen testified there were no guns or ammunition in the home, as they had moved those items to a family member's home. No family members, including children, visited the home.

- 4 -

¶ 14    Bruce testified his grandson, the newborn mentioned by Buchen, was then seven years old. He often asked about defendant, though he had not seen her since her arrest. Bruce agreed with Buchen's testimony about their ability to supervise defendant if she were released. Bruce would not allow defendant to have contact with his grandson. Bruce had moved his firearms and ammunition to his uncle's house in another town.

¶ 15    Defense counsel provided character statements on defendant's behalf. Among the character statements were attestations by mothers whose children defendant had safely cared for.

¶ 16    Defense counsel further proffered evidence of defendant's activity while incarcerated. Defendant had no disciplinary infractions. She attended a life skills course, which met weekly over the course of one year. Defendant had participated in the course multiple times, attending 80% of the classes. Defendant also attended 60% of the monthly faith-based classes at the jail.

¶ 17    Defense counsel pointed to the trial record as evidence defendant was not a threat and would comply with conditions of release. Defendant called Sophia's mother "when there was a turn for the worse of the child's health." Defendant called 911 and stayed until police arrived. She submitted to interviews at the scene and at the police department, as well as to an interview by DCFS. Defense counsel further pointed to testimony by Dr. Nathaniel Patterson, who testified he found no evidence of a broken arm during the autopsy, and argued there was no abuse by defendant on January 3, 2022.

¶ 18    The circuit court granted the State's petition and denied defendant pretrial release. The court considered the factors enumerated in section 110-6.1(g) of the Code (725 ILCS 5/110-6.1(g) (West 2024)). The court considered the first factor, the nature and circumstances of the offense, including whether the offense was violent (*id.* § 110-6.1(g)(1)), "a prime factor in this

case." The court observed "defendant was caretaking for a 19-month-old" who suffered "multiple injuries on multiple planes" and this showed "violence and significant force." The court concluded Sophia endured "extremely violent acts." Taking note of defendant's history (*id.* § 110-6.1(g)(2)), the court was aware of the absence of prior convictions but noted the January 2022 incident and the fact "Dr. [Channing] Petrak testified that the injuries were consistent with abuse." The court addressed defendant's argument of the lack of evidence of a fracture and noted Dr. Petrak testified "to other injuries besides the fracture," including "multiple planes, top of the head, the mouth injury, and multiple planes of the body," as well as a compression fracture, which would not have been inconsistent with Dr. Patterson's findings. The court expressly found by clear and convincing evidence "defendant was involved" in the prior incident. The court found her a threat to the community, specifically children.

¶ 19 The circuit court then addressed whether the State proved no conditions or combination of conditions could mitigate defendant's threat to children by clear and convincing evidence and found it had. The court expressed it considered the factors in section 110-5(a) (*id.* § 110-5(a)) and highlighted the factors of the nature and circumstances of the offense, the weight of the evidence against defendant, defendant's history, and the seriousness of the threat. *Id.* § 110-5(a)(1)-(4)). The court balanced defendant's history and her behavior at the Lincoln County jail against the nature and circumstances of the offense. The court highlighted "the testimony of Dr. Patterson, Dr. Petrak, Dr. [Ashley] Abraham, Dr. [Sumesh] Jain \*\*\*, Dr. [Bailey] Hester, and others" as illustrative of the significant weight of the evidence against defendant.

¶ 20 The circuit court concluded the question of mitigation depended upon the threat posed and concluded that threat was death and the community at risk was a population that could

not speak for itself. The court also found the fact Sophia's death occurred in defendant's home significant. The court concluded home confinement and electronic monitoring would not detect a child being in a home. And the home confinement "would be akin to almost self-reporting given that it would put the onus on the family to report violations if a minor child were brought into the home." The court concluded it would detain defendant in case Nos. 22-CF-29 and 22-CF-30 for the same reasons.

¶ 21 Defendant filed a motion for relief, asserting the circuit court erroneously found no conditions or combination of conditions can mitigate any threat posed by defendant. At the hearing on the motion, defendant highlighted the fact, in 2022, the State did not seek pretrial detention of defendant and the court ordered her released on bond and asked what had changed since that time to permit her detention now.

¶ 22 The circuit court denied the motion.

¶ 23 This appeal followed.

¶ 24         II. ANALYSIS

¶ 25 On appeal, defendant contends the State failed to prove by clear and convincing evidence no condition or combination of conditions would mitigate her threat. Defendant emphasizes the absence of any evidence of a criminal activity in her past, including during her time while incarcerated. Defendant further emphasizes her mother's and stepfather's testimony she would be supervised at all times and the fact she was not detained upon her arrest in 2022.

¶ 26 Because live witness testimony was presented at defendant's pretrial detention hearing, we will not disturb the circuit court's decision under section 110-6.1 or the underlying factual findings supporting that decision unless those findings are against the manifest weight of the evidence. *People v. Morgan*, 2025 IL 130626, ¶ 54. Upon our review of the proffers and the

evidence, we will find the circuit court's ruling to be against the manifest weight of the evidence only if the opposite conclusion is clearly evident. See *In re A.R.*, 2025 IL App (4th) 250668, ¶ 66.

¶ 27    Subject to certain conditions, the Code creates a presumption all criminal defendants are entitled to pretrial release. 725 ILCS 5/110-2(a) (West 2024). To overcome that presumption and obtain the denial of pretrial release on the basis the defendant is dangerous, the State must prove by clear and convincing evidence, in part, "the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case" (*id.* § 110-6.1(e)(2)), and "no condition or combination of conditions *** can mitigate *** the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case" (*id.* § 110-6.1(e)(3)(i)). A defendant's pretrial detention is unlawful if the State fails to meet its burden on any one of the elements of section 110-6.1(e). See *People v. Thomas*, 2025 IL App (4th) 251082-U, ¶ 30 (quoting *People v. Sorrentino*, 2024 IL App (1st) 232363, ¶ 32, citing 725 ILCS 5/110-6.1(e) (West 2022)). The questions of whether a criminal defendant poses a threat sufficient to deny pretrial release and whether a condition or conditions can mitigate that threat "are two sides of the same coin." *People v. Romine*, 2024 IL App (4th) 240321, ¶ 16. "[T]he nature and severity of the threat necessarily determine the nature and severity of the conditions that could—or could not—mitigate the threat." *Id.*

¶ 28    The Code provides factors to be considered with the "specific articulable facts of the case" in weighing the question of whether a criminal defendant presents a real and present threat. 725 ILCS 5/110-6.1(g) (West 2024). A defendant's dangerousness must "be individualized," and "no single factor or standard may be used exclusively to order detention."

*Id.* § 110-6.1(f)(7). The statutory factors of section 110-6.1(g) are as follows:

"(1) The nature and circumstances of any offense charged, including whether the offense is a crime of violence, involving a weapon, or a sex offense.

(2) The history and characteristics of the defendant including:

(A) Any evidence of the defendant's prior criminal history indicative of violent, abusive, or assaultive behavior, or lack of such behavior. \*\*\*

(B) Any evidence of the defendant's psychological, psychiatric or other similar social history which tends to indicate a violent, abusive, or assaultive nature, or lack of any such history.

(3) The identity of any person or persons to whose safety the defendant is believed to pose a threat, and the nature of the threat.

(4) Any statements made by, or attributed to the defendant, together with the circumstances surrounding them.

(5) The age and physical condition of the defendant.

(6) The age and physical condition of any victim or complaining witness.

(7) Whether the defendant is known to possess or have access to any weapon or weapons.

(8) Whether, at the time of the current offense or any other offense or arrest, the defendant was on probation, parole, aftercare release, mandatory supervised release, or other release from custody pending trial ***.

(9) Any other factors *** deemed by the court to have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior." *Id.* § 110-6.1(g)(1)-(9).

¶ 29    Applying these factors to the individualized facts of this case, we find the circuit court's order is not against the manifest weight of the evidence. The evidence shows a violent and brutal offense (*id.* § 110-6.1(g)(1)) committed with repeated strikes against a vulnerable victim (see *id.* § 110-6.1(g)(6)), the child of defendant's paramour, in defendant's home. The evidence further reveals defendant committed two violent attacks against the same victim in the span of approximately one month (*id.* § 110-6.1(g)(2)). Sophia suffered multiple severe injuries on "multiple planes" due to defendant's brutality.

¶ 30    Moreover, the circuit court's finding the State clearly and convincingly proved defendant's threat cannot be mitigated is not against the manifest weight of the evidence. As this court has held, "the evidence of a defendant's charged conduct, even if it took place on a single occasion, may reflect such a departure from the basic expectations of civil society that it becomes difficult to predict the defendant's compliance with court orders *** if the defendant is placed on pretrial release." *Romine*, 2024 IL App (4th) 240321, ¶ 20. Here, defendant's conduct underlying the murder and aggravated-battery charges reflects such a departure. Sophia, having been taken into another room by defendant, suffered "injuries to her forehead, back of [her] head,

eyes, face, chest, back, buttocks, arm, leg, and brain." We note this conduct is not alone the sole factor, as defendant's history includes two separate incidents of violence against a vulnerable child in defendant's care.

¶ 31 Defendant's case law is factually distinguishable and unpersuasive. In *People v. Russell*, 2023 IL App (4th) 230918-U, ¶ 4, the defendant was not charged with forcibly striking and beating a vulnerable child but with the failure to supervise a two-year-old child who drowned in a bathtub. In *Thomas*, the charges did not allege a brutal attack but the administration of an excessive does of ZzzQuil to a 13-month-old. See *Thomas*, 2025 IL App (4th) 251082-U, ¶¶ 6, 11. Notably, the *Thomas* defendant had been granted pretrial release when initially charged with aggravated battery but denied pretrial release after the child died approximately six weeks later and the defendant was charged with murder. *Id.* ¶¶ 6, 9, 17. In overturning the order detaining the *Thomas* defendant pretrial, the *Thomas* majority noted, in part, the defendant "had complied with all conditions of her earlier release for a period of weeks." *Id.* ¶ 31.

¶ 32 We further note defendant's emphasis on the circuit court's decision in 2022 to release her on bail is unconvincing. The difference between allowing defendant to be released from jail in 2022 if she were to post $300,000 in bond and denying her pretrial release now is that a trial occurred in the meantime. In that trial, the circuit court heard evidence of Sophia's extensive injuries and defendant's brutality.

¶ 33                                                III. CONCLUSION

¶ 34            We affirm the circuit court's judgment.

¶ 35            Affirmed.